CLERK'S OFFICE U.S. DISTRICT COURT AT ROANOKE, VA
FILED
9/21/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| STRAUSSIEUS UVETTE WARREN, SR., Plaintiff, | ) | Civil Action No. 7:26-cv-00682 |
| v. | ) | **MEMORANDUM OPINION** |
| CITY OF ROANOKE, VIRGINIA, *et al.*, Defendants. | ) | By: Hon. Thomas T. Cullen, United States District Judge |

Plaintiff Straussieus Uvette Warren, Sr., proceeding *pro se*, filed this action against the following parties: the City of Roanoke; the Roanoke City Department of Social Services ("RCDSS"); Roanoke Police Department ("RPD"); RCDSS Family Services Specialist ("FSS") Eric Sarver; Child Protective Services ("CPS") Investigations Supervisor Donald Goss; Senior FSS Caseworker Madeline Shepherd; Adult Protective Services ("APS") Caseworker Tegan Anthis; RPD Officer Matthew Mulligan; RPD Officer J.M. Thompson; and RPD Officer B. Noel. Warren brings claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, alleging that Defendants violated his constitutional rights in various ways during a three-year DSS investigation into his family's living conditions and subsequent proceedings in the Roanoke City Juvenile & Domestic Relations District Court ("J&DR Court").

This matter is before the court on Warren's motion for leave to proceed *in forma pauperis*. Warren qualifies as a threshold matter. But after undertaking its independent duty to screen initial filings under 28 U.S.C. § 1915(e), the court will dismiss Warren's *Monell* claim and § 1985 claim. The court, however, will allow Warren to proceed on his § 1983 claim against RPD Officers Thompson and Noel.

## I. <u>Statement of Facts and Procedural Background</u>

The following facts are taken from Warren's Complaint,[1] and, for the purpose of screening Warren's claims under § 1915, the court applies a liberal 12(b)(6) standard and accepts these facts as true. 28. U.S.C. § 1915(e)(2)(B)(ii); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This matter arises from a three-year RCDSS investigation into the living conditions of the Warren household and the resulting child neglect and abuse proceedings in the J&DR Court. (*See generally* Compl. [ECF No. 1].) Warren's Complaint details his interactions with the municipal defendants.

Warren claims that RCDSS gathered "perfect, uncorrupted knowledge of the family's exact residence" when RCDSS Caseworker Sharon Brown first visited Warren's residence at 1216 Tazewell Ave SE, Roanoke, Virginia, in July 2023. (Compl. at 5; J&DR Statement ¶ 1.) On August 4, 2024, William and Ashley Honaker were living with Warren at 1216 Tazewell Ave. (J&DR Statement ¶ 2.) On that day, RCDSS Caseworker Madeline Shepherd and APS Caseworker Teagan Anthis visited the residence to investigate an anonymous tip that Mr. Honaker was purchasing narcotics for his adult daughter. (*Id.*) Warren contends that DSS inappropriately co-mingled these unrelated narcotics allegations into his children's custody

---

[1] The court notes that voluminous J&DR and administrative records and a USB file containing video footage captured by Warren accompany Warren's Complaint. The documents are original records and exist only in physical form. The court only includes the facts and information from the documents and videos that are relevant to screening Warren's claims under § 1915. These documents include the "Statement of Systemic Due Process Violations & Address Fraud" filed September 1, 2026, with the J&DR Court [hereinafter "J&DR Statement"], USB Video Files #20250728_165257 and #20250728_165257 [hereinafter "RPD Video"], "Preliminary Child Protective Order – Abuse and Neglect" filed July 28, 2025, with the J&DR Court [hereinafter "Protective Order"], and RPD's "Incident Details Report" from July 28, 2025 [hereinafter "Incident Details Report"].

folders by including the intake report for *the Honaker's* home visit in the DSS files for *Warren's* children. (*See* Compl. at 5; J&DR Statement ¶ 2.) Plaintiff alleges that, after walking across the street to 1217 Tazewell Avenue to ask for Warren, "the workers threw out the 2023 Sharon Brown address data" and incorrectly logged "1217 Tazewell Avenue" into his children's files as their home address. (J&DR Statement ¶ 2.)

On December 18, 2025, Warren contacted the Virginia Department of Social Services ("VDSS") Regional Office and requested his children's CPS files. (Compl. at 5; J&DR Statement ¶ 3.) He states that he reported the record mismanagement to the VDSS officer who contacted Mr. Goss, a CPS supervisor, and directed that he release the files to Warren. (J&DR Statement ¶ 3.) When he picked up the files on January 13, 2025, Warren claims that "the file infrastructure was completely corrupted." (J&DR Statement ¶ 3.) For example, he states that the files contained the incorrect 1217 Tazewell Avenue address, misspelled his first name, and mislabeled his children as "Multi-Race" instead of "Black." (*Id.*) Warren alleges that these inconsistencies verify "an unpurged file swap with the neighboring household." (*Id.*)

On January 19, 2025, Warren and his family were displaced from their Tazewell Avenue home and moved into an apartment on their neighbor's property. (*Id.* ¶ 4.) On June 17, 2025, RCDSS Caseworker Eric Sarver visited the property purportedly looking for Warren but first spoke with the downstairs tenants and the property's landlord. (*Id.* ¶ 5.) Warren interacted with Mr. Sarver from his upstairs doorway apartment and claims that Mr. Sarver simply recorded "individual AA male live upstairs" instead of entering his legal name or explicit unit number before he left, "choosing to treat the entire multi-unit building as a blanket target." (*Id.* ¶ 5.) Mr. Sarver returned to the unit the following day and spoke with Warren outside of his

apartment door, informing him that they were executing a mandatory house check in response to a CPS referral for neglect and abuse. (*Id.* ¶ 6.) Mr. Saver returned to the apartment on July 24, 2025, with copies of the files that Warren had requested in 2025. (*Id.* ¶ 7.) Warren claims that "the back pages were completely altered, re-written, and textually conflicted" with the files he originally received. (*Id.*)

Next, Warren alleges that, on July 28, 2025, Mr. Sarver arrived at his residence accompanied by RPD Officers Thompson and Noel. (*Id.* ¶ 8.) Warren claims that these officers, acting under color of law, executed an invasive, warrantless physical entry and search of his apartment. (Compl. at 6.) Warren alleges that "this deployment lacked probable cause, judicial warrants, or emergency consent." (*Id.*) Warren's Complaint references video footage accompanying this allegation (*see* RPD Video), which first shows the officers standing at the top of an outdoor stairwell that connects to the hallway of the upstairs apartment units, including the Warrens' apartment, while Mr. Sarver presents a protective order to Warren requiring him to grant CPS entry into the home. (*See* Protective Order.) Warren, who recorded the footage, can be heard arguing with Mr. Sarver. (*See* RPD Video.) The footage ends there, and the next clip shows the officers walking briefly through the one-bedroom apartment with Mr. Sarver before returning to the stairwell. (See *id.*)

Warren also attached RPD's incident report with a redacted call log, which indicates that the police responded to a call from an address around 3:00 p.m. on July 28, 2025. (*See* Incident Details Report.) The report ends about 30 minutes later with the log: "[N]o offense at this time." (*See id.*) Warren alleges that this entry establishes "direct, actual, physical

knowledge by both the city police department and RCDSS" that the family lived in Apartment 1. (J&DR Statement ¶ 8.)

Warren further alleges that between August 4, 2025, and August 6, 2025, "individual administrative caseworkers including Eric Sarver and Supervisor Donald Goss actively conspired to manipulate public records database entries." (Compl. at 6.) On August 4, 2025, Warren and his wife granted physical custody of their children to a relative. (J&DR Statement ¶ 9.) Both parents recorded their addresses as "1309 9th Street SE, Apt 1, Roanoke, Virginia 24013" on this filing. (*Id.*) Around this time, RCDSS filed a Motion to Show Cause Summons claiming the parents were unreachable or noncompliant. (J&DR Statement ¶ 9.) The summons included an incorrect address for Warren and his wife, stating that they resided in "Unit 3" at "1309th Street" in Roanoke. (*Id.*) Warren claims that RCDSS administrative staff "deliberately cloned the biological mother's separate metrics onto the father's name" and used the non-existent street name and fake unit number "to ensure the postal service could never deliver it." (*Id.*) In doing so, "they engineered an artificial record of parent non-compliance." (Compl. at 6.) Warren alleges that "this manipulation directly defrauded the J&DR District Court into signing a total case withdrawal order on August 6, 2025." (*Id.*) The alleged scheme left Warren in an "an absolute state-induced notice blackout" until June 18, 2026. (*Id.*)

Warren also alleges that "the City of Roanoke, through its operational leadership at RCDSS and the RPD, maintained an unchecked administrative custom and moving practice of record manipulation, file contamination and unauthorized cross-department profile mergers." (Compl. at 3.) Warren further claims that "the failure to train staff on database

address verification patterns directly caused the systemic constitutional deprivations suffered by the Plaintiff." (*Id.*)

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 1915(e), which governs *in forma pauperis* proceedings, the court has a duty to screen initial filings. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656–57 (4th Cir. 2006). When screening, the court should liberally construe the filings of *pro se* litigants, using a "less stringent standard[] than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). But even a *pro se* complainant must still state a plausible claim for relief, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and the court must dismiss a case "at any time" if the court determines that the complaint "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

The standards for reviewing a complaint for dismissal under § 1915(e)(2)(B)(ii) are the same as those that apply when a defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(6)—failure to state a claim on which relief may be granted. *See De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). Thus, in reviewing a complaint under this statute, the court must accept all well-pleaded factual allegations as true and view the complaint in the light most favorable to the plaintiff. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). To survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a

complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

Federal courts also "have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Melton v. Naumann*, No. 25-3343-BAH, 2025 WL 2938362, at *2 (D. Md. Oct. 16, 2025) (granting motion for leave to proceed *in forma pauperis* but dismissing complaint due to lack of subject-matter jurisdiction).

## III. DISCUSSION

As an initial matter, because the court found that Warren satisfies the necessary standard to proceed *in forma pauperis*, *see* 28 U.S.C. § 1915(a), it granted his motion to proceed in that manner. (*See* ECF No. 4.) But § 1915(e) requires a court to screen a plaintiff's initial filing for plausibility and subject-matter jurisdiction. 28 U.S.C. § 1915(e). Therefore, the court will evaluate Warren's claims in the following order: (1) the § 1985 claim against Eric Sarver and Donald Goss; (2) the *Monell* claim against the City of Roanoke; and (3) the § 1983 claim against Officer J.M. Thompson and Officer B. Noel.

### A. Subject-Matter Jurisdiction

As a threshold matter, the court must first determine that it has subject-matter jurisdiction. *See Melton*, 2025 WL 2938362, at *2. The court finds that it has subject-matter

jurisdiction over the present action under 28 U.S.C. § 1331 as Warren alleges a claim under § 1983. *See Andrews v. Clark*, 561 F.3d 261, 265 (4th Cir. 2009).

**B. Count II: Eric Sarver and Donald Goss Under § 1985**

Warren does not specify which provision he bases his § 1985 claim on, although the court interprets the caption of his claim, "Civil Conspiracy to Defraud and Suppress Due Process," as alleging a claim under § 1985(3). (Compl. at 6.) But Warren fails to state a claim under this provision.

To state a claim under § 1985(3), a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). "In order to prove a section 1985 conspiracy, a claimant must show an agreement or a meeting of the minds by defendants to violate the claimant's constitutional rights." *Facey v. Dae Sung Corp.*, 992 F. Supp. 3d 536, 541 (D. Md. 2014). "This is a 'relatively stringent standard,' and the Fourth Circuit 'has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy.'" *Borkowski*, 492 F. Supp. 3d at 483–84 (rejecting § 1985(2) claim because plaintiffs' complaint alleging that the defendants "employed facially discriminatory customs and policy . . . and treated one class of victims differently from others" based on discriminatory motives was a "shotgun[-]style pleading" and did not "rise to the level of concreteness required to meet the '"relatively stringent' standard set by the Fourth Circuit in [*Simmons*] for alleging a conspiracy" (quoting *Simmons*, 47 F.3d at 1377)).

Here, Warren's allegations do not meet the "relatively stringent standard" to state a claim of civil conspiracy under § 1985(3). *Id.* at 484. Warren brings his conspiracy claim against Eric Sarver, Donald Goss, and unidentified "individual administrative caseworkers." (Compl. at 6.) Warren's allegation that Mr. Sarver and Mr. Goss "actively conspired" to manipulate database entries and his vague reference to other administrative caseworkers falls well short of establishing any communication or "meeting of the minds" between these individuals. (Compl. at 6.) *See Facey*, 992 F. Supp. 3d at 541. Moreover, Warren's allegations of a discriminatory motive to deprive Warren of his procedural due process rights are conclusory and speculative. Warren alleges that the agents used a non-existent street name and fake unit number "to ensure the postal service could never deliver" various notices to him, and that, in doing so, "they engineered an artificial record of parent non-compliance" that left Warren in an "an absolute state-induced notice blackout." (J&DR Statement ¶ 9; Compl. at 6.) These allegations do not give rise to a plausible inference that the caseworkers harbored a discriminatory motive or that they communicated to deprive Warren of his procedural due process rights. *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) (dismissing § 1985(3) conspiracy claim because plaintiff failed to establish any communications between the defendants and merely stated that there was generally a meeting of the minds). For these reasons, the court will dismiss the § 1985 claim.

**C. Count III: City of Roanoke under *Monell***

Warren alleges that the City of Roanoke, through its operational leadership at RCDSS and the RPD, maintained an unlawful administrative custom and practice of record manipulation, file contamination, and unauthorized cross-department profile mergers *and*

failed to train staff on database address verification, which caused the deprivation of his procedural due process rights. (*See* Compl. at 6.) But because Warren does not provide sufficient factual support for these conclusory allegations, he has failed to state a claim based on *Monell* liability.

In *Monell v. Department of Social Services of the City of New York*, the United States Supreme Court held that while local governmental units cannot be held liable under a theory of *respondeat superior* in § 1983 claims, they nevertheless may be held responsible when the unit's policy or custom inflicts a constitutional deprivation upon a plaintiff. 436 U.S. 658, 694 (1978). In other words, a municipality is "liable only for its own illegal acts," rather than those of their employees. *Owens v. Balt. City State's Att'y's Off.*, 767 F.3d 379, 402 (4th Cir. 2014).

To state a claim for *Monell* liability, a plaintiff must "plausibly allege that his constitutional harm stems from the acts of a municipal employee taken in furtherance of some municipal policy or custom." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 308 (D. Md. 2020) (internal quotations omitted) (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984)). A plaintiff may establish the existence of a "policy or custom," with the requisite particularity, in one of four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Johnson*, 452 F. Supp. 3d at 308 (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)); *see also Owens*, 767 F.3d at 402–03 (holding that plaintiff sufficiently alleged a widespread practice of

officers knowingly suppressing exculpatory evidence in criminal prosecutions on multiple occasions, and his allegations, though brief, made out a plausible claim of an "impermissible custom"); *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 535 (D. Md. 2020) (determining that complaint survived the 12(b)(6) stage because it identified three instances when police department's failure to train officers to disclose *Brady* evidence and failure to modify *Brady* training program led to wrongful convictions); *Harris v. Piedmont Reg'l Jail Auth.*, No. 3:24-cv-799, 2025 WL 2581839, at *10 (E.D. Va. Sep. 5, 2025) (holding that merely stating that "it was the custom, practice or policy of defendant-jail to inadequately train their employees . . . [or] failing to adequately discourage constitutional violations on the part of their employees" was a conclusory, formulaic recitation of the elements of a *Monell* claim and could not survive a motion to dismiss).

Here, Warren brings his *Monell* claim against the City of Roanoke, based on structural leadership of RCDSS and RPD. (Compl. at 6.) Warren names DSS caseworker Madeline Shepherd, APS caseworker Teagan Anthis, and RPD Officer Matthew Mulligan in the Complaint's case caption. (*See id.* at 4.) But it is unclear as to whether Warren seeks to bring a *Monell* claim against these individuals. The court interprets the *Monell* claim's reference to RCDSS and RPD's "operational leadership" to include these individuals because they are not listed in their individual capacities. (*See id.*) While a plaintiff must allege that his constitutional harm stems from the acts of a municipal employee taken in furtherance of some municipal policy or custom, a *Monell* claim is only properly alleged against the municipality, itself, rather than an individual employee. *See Johnson*, 452 F. Supp. 3d at 308; *Owens*, 767 F.3d at 402 (4th

Cir. 2014). Accordingly, the court finds that Warren fails to state a *Monell* claim to the extent that he intended to file such a claim against Ms. Shepherd, Ms. Anthis, and Officer Mulligan.

As to the other municipal entities, Warren named RCDSS and RPD as defendants in his case caption (*see* Compl. at 4), but only alleges the *Monell* claim against the City of Roanoke, through its operational leadership at RCDSS and the RPD, rather than against all three entities. (*See id.* at 6.) As such, the court will evaluate the *Monell* claim as stated against the City of Roanoke.[2]

First, Warren bases his *Monell* claim on a "failure to train" theory. (Compl. at 6.) Warren's allegations do not cite specific instances of failures to train and only formulaically recite that "the failure to train staff on database verification patterns directly caused the systemic constitutional deprivations" Warren suffered. (*Id.* at 6.) *See Harris,* 2025 WL 2581839, at *10; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This is insufficient to state a *Monell* claim.

Next, the court interprets Warren's allegation that the City of Roanoke "maintained an unchecked administrative custom and moving practice of record manipulation, file contamination and unauthorized cross-department profile mergers" (Compl. at 6), to be based on a theory of "condonation," or the "failure by municipal policymakers to put a stop to or

[2] Indeed, these other municipal departments may not be proper defendants under well-established case law. *See Rutledge v. Town of Chatham*, No. 4:10-cv-00035, 2010 WL 3835662, at *1 (W.D. Va. Sep. 30, 2010) (treating plaintiff's claims against Chatham and Danville Police Departments as claims against the cities because municipal police departments in Virginia do not have the capacity to be sued under Virginia law*); Mercer v. Fairfax Cnty. Child Protective Servs.*, No. I:15-cv-302, 2015 WL 5037636, at *3 (E.D. Va. Aug. 25, 2015) (holding that Fairfax County Child Protective Services—a unit operating under the Fairfax County Department of Social Services—was not an entity with capacity to be sued under Virginia law); *A.R.L.* ex rel. *Dwyer v. Norfolk Dep't of Hum. Servs.*, 2020 WL 14101832, at *10 (E.D. Va. Nov. 9, 2020) ("[T]he court is not aware of any local or state mandate that gives local departments of social services the capacity to sue or be sued[.]") (quoting *Ross v. Franklin Cnty. Dep't of Soc. Servs.*, 186 F. Supp. 3d 526, 535 (W.D. Va. 2016)).

correct a widespread pattern of unconstitutional conduct." *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

To state a *Monell* claim under the condonation theory, a plaintiff must establish "a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Owens*, 767 F.3d at 402; *see Newhard v. Borders*, 649 F. Supp. 2d 440, 446 (W.D. Va. 2009) (dismissing complaint for lack of facts that would "support a conclusion that the Town's governing officials were actually or constructively aware of persistent and widespread constitutional deprivations by Town officers."). A plaintiff faces a high bar in establishing deliberate indifference and generally must allege patterns of a municipality condoning constitutional violations, save for obvious and extreme examples of deliberate indifference. *See Lane v. Fayette Cnty. Comm'n*, No. 2:18-cv-01223, 2019 WL4780815, at *3 (S.D.W. Va. Sep. 30, 2019).

Here, Warren's conclusory allegation that the City of Roanoke "maintained an unchecked administrative practice and custom" fails to meet the high bar to demonstrate that the City knew of and condoned unconstitutional practices among its municipal employees. (Compl. at 5–6.) *See Lane*, 2019 WL4780815, at *3. Critically, he does not allege *any* other instances of similar conduct. Warren's best support for his claim stems from his statement that he called the VDSS Regional Office to report the mismanagement of records and that the VDSS then placed a direct call to Mr. Goss to release the CPS files to Warren. (*See* J&DR Statement ¶ 3.) But these facts only allege that VDSS, a state agency, was on notice of the alleged unconstitutional conduct occurring among RCDSS employees. Warren does not allege

that the City of Roanoke was "aware of the conduct and made a deliberate choice" to condone it. *Lane*, 2019 WL4780815, at *3.

Moreover, the instances of erroneous data entries regarding Warren's home address purportedly made first by Ms. Sheperd and Ms. Anthis in August 2024, and then by DSS administrative personnel in August 2025, fall short of establishing a persistent and widespread practice, the duration and frequency of which would place municipal policymakers on actual or constructive notice of the conduct. (*See* Compl. at 5–6; J&DR ¶¶ Statement 2,5,9.) *See Owens*, 767 F.3d at 402; *see also Newhard*, 649 F. Supp. 2d at 466 ("A policy or custom giving rise to § 1983 liability will not, however, 'be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.'" (quoting *Milligan,* 743 F.2d at 230)). Warren has not alleged a pattern of municipal condonation of alleged constitutional violations by the City of Roanoke, and, accordingly, fails to meet the high bar required to establish deliberate indifference. *See Lane*, 2019 WL4780815, at *3. Therefore, Warren's *Monell* claim will also be dismissed.

**D. Count I: Officers Thompson and Noel under § 1983.**

But Warren has alleged sufficient facts to state a claim under § 1983 for an unreasonable search in violation of the Fourth Amendment. To establish a Fourth Amendment violation under § 1983, the plaintiff must show that the officers' actions were unreasonable when judged by an objective standard in light of the facts and circumstances confronting the officer. *Cribfield v. City of Danville Police Dept.*, No. 4:07-cv-10, 2007 WL 3003279, at *2 (W.D. Va. Oct. 11, 2007) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A warrantless entry into an individual's home is presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 586 (1980).

But this presumption may be overcome if the circumstances give rise to certain reasonable exceptions to the warrant requirement, such as the presence of exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citing *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 474–75 (1971) ("[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show. . .the presence of 'exigent circumstances.'").

Here, Warren submitted video evidence, the DSS protective order granted by the J&DR Court, and the RPD incident report from July 28, 2025, to support his allegation that RPD Officers Thompson and Noel, acting under color of law, executed an invasive, warrantless, physical entry of Warren's apartment in violation of the Fourth Amendment.[3] (Compl. at 5–6.) He states that the officers lacked probable cause, judicial warrants, or emergency consent. (*Id.* at 6.)

The video footage, recorded by Warren, first shows the officers standing at the top of an outdoor stairwell leading to the upstairs units of the apartment complex, which includes Warren's apartment. (*See* RPD Video.) They remain there for several minutes while Mr. Sarver presents a Protective Order to Warren, granting CPS the authority to enter his home. (*See* RPD Video.) Warren is heard arguing with Mr. Sarver. (*See id.*) The video footage ends there, and in the next clip, the officers are seen walking through the home with Mr. Sarver while he briefly inspects the premises of the one-bedroom apartment. (*See id.*)

[3] Although the records are not attached to or referenced in the Complaint, under the lenient standard of review afforded to *pro se* filings, the court nevertheless considers, for the sole purpose of screening the Complaint under § 1915, the factual averments therein.

The Protective Order depicted in the video was granted by the J&DR court and ordered that "CPS workers be immediately allowed to complete a walkthrough of the home to observe the children's living conditions." (*See* Protective Order.) The court order, however, did not separately grant RPD officers the authority to enter the home. (*See id.*) Although much of the call log is redacted, the Incident Details Report indicates that the police arrived at the apartment in response to a caller, possibly Mr. Sarver, which they received around 3:00 p.m. (*See* Incident Details Report.) Warren's Complaint states that Mr. Sarver arrived at his apartment "accompanied by" the officers. (J&DR Statement ¶ 8.) The incident report was closed as "no offense at this time" about 30 minutes after they received the call. (*See* Incident Details Report.)

Accordingly, Warren has presented sufficient facts to support the allegation that the police entered and searched his home with Mr. Sarver without independent authority granted by the Protective Order, a separate search warrant, or another lawful basis. *See Payton*, 445 U.S. at 586. Because a warrantless search of a residence is presumptively unreasonable, Warren has stated a claim for a Fourth Amendment violation and Officers Thompson and Noel must overcome that presumption.[4] *See King*, 563 U.S. at 459; *Coolidge,* 403 U.S. at 474–75. Therefore, the court finds that the defendant has stated a § 1983 claim under the Fourth Amendment against Officers Thomspon and Noel.

## IV. <u>CONCLUSION</u>

[4] The officers may do so through discovery, in which case they would be entitled to summary judgment on this claim.

For the reasons discussed above, the court will permit Warren to proceed as to Count I against Officers Thompson and Noel but will dismiss his Complaint as to Counts II and III against all other defendants.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 21st day of September, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE